UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Lisa Setzer,

    Plaintiff,

    v.

Heartland Security
  Mortgage, LLC, *et al.*,

    Defendants.

Case No. 1:03cv558

Judge Michael H. Watson

## OPINION AND ORDER

Before the Court is the February 14, 2005 Motion of Defendants, Heartland Security Mortgage, LLC (hereinafter "Heartland Mortgage") and National City Mortgage (hereinafter "NC Mortgage") (hereinafter collectively "Defendants"), for Summary Judgment (Doc. 16). Plaintiff Lisa Setzer (hereinafter "Plaintiff") filed a Memorandum in Opposition on March 18, 2005 (Doc. 25). Defendants filed a Reply Memorandum on April 1, 2005 (Doc. 27).

For the reasons which follow, the Motion of Defendant for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

**I.    FACTS**

In early 2002, NC Mortgage and Heartland Security, Inc. entered into a joint venture and created a new entity, Heartland Mortgage. (DeWitte Depo. 16-18). The primary responsibility of Heartland Mortgage was to provide mortgage loan services to new customers of TK Constructors ("TK"), an Indiana-based home builder. (Setzer Depo. 162)

On April 8, 2002, Plaintiff was hired by Dave DeWitte for a position as a Senior Loan Officer with NC Mortgage.  (Setzer Depo. 107,139, 185-186).  Plaintiff's initial hire was with NC Mortgage as Heartland Mortgage had not received the necessary approvals from the Federal Housing Administration ("FHA"). Plaintiff was to remain as a NC Mortgage employee until FHA approval was completed.[1] Upon commencement of her employment with NC Mortgage, Plaintiff reviewed and signed an application for employment. The application stated that the employment relationship was at-will, and subject to termination at anytime and for any reason, with or without notice. (Setzer Depo. 171-173).  The application also provided that only the president of NC Mortgage could enter into an employment contract with the applicant, and then only in writing. (Setzer Depo. 113-15). During her employment with both NC Mortgage, and subsequently Heartland Mortgage, Plaintiff worked out of Heartland Mortgage's Fairfield, Ohio office and was supervised by Mr. DeWitte, who continued to work for NC Mortgage, but also had oversight responsibility for Heartland Mortgage. (Riegle Depo. 56-58; Setzer Depo. 208-209).

As part of Plaintiff's duties as a Senior Loan Officer, Plaintiff was required to provide mortgage loan services for customers of TK.  (DeWitte Depo. 16-18; Setzer Depo. 83). After a TK customer decided to build a home, TK salesperson presented optional financing packages to the customer.  (Riegle Depo. 22; DeWitte Depo. 88-82). If a customer selected a financing package, the TK salesperson helped the customer fill

---

[1] On or around June 24, 2002, Heartland received FHA approval to process loans. Plaintiff's employment with NC Mortgage was transferred to Heartland Mortgage's Fairfield, Ohio office.  (Setzer Depo. 147; DeWitte Depo. 120-122).

out the application.  The TK salesperson then forwarded the package to Heartland Mortgage for processing by one of the loan officers.  When the loan closed, TK received a $300 credit from Heartland Mortgage on the closing costs, and the TK salesperson received a $100 commission.  (Riegle Depo. 22-23, 110-111).

The record is unclear, but at some point after beginning employment, Plaintiff allegedly expressed concern to Mr. DeWitte about the legality of the $300 credit and $100 commission, believing them to be violations of the Real Estate Settlement Procedures Act (RESPA).  Plaintiff states she raised these issues on at least two separate occasions to Mr. Dewitte.  Plaintiff also contends that she spoke with Thomas Riegle, the controller for TK, who served as the primary communications link between TK and Mr. DeWitte, and Mark Pressly, a TK sales manager, about these issues. (Setzer Depo. 155-157).  Additionally, Plaintiff alleges she began receiving unsigned loan applications from TK salespeople.  (Setzer Depo. 151).

Shortly after Plaintiff began work at Heartland Mortgage's Fairfield, Ohio office, Gary Trovillo was hired as a second loan officer.  He was required to perform the same mortgage and loan services as Plaintiff. (Setzer Depo. 168-169).  In mid-July 2002, Messrs. DeWitte and Riegle met with Mr. Trovillo to discuss his job performance over the first few weeks of his job.  After determining his performance was unsatisfactory, Mr. Trovillo's employment was terminated. (Riegle Depo. 100-102).

After Mr. Trovillo's termination, Plaintiff was asked to take over loans which Mr. Trovillo had been working on.  One loan in particular had a $10,000 contingency[2] added

---

[2]The contingency amounts were included in the TK loan packages as a way to finance any unforseen circumstances that might arise and increase the anticipated construction cost of a home.  After the home was built, any leftover money could be used to lower the principle on the loan, or was given as

to the loan amount above the actual cost.  (DeWitte Depo.  151-152, 155, 244; Setzer Depo. 219-221).  On this loan, Plaintiff allegedly became aware of a plan by the home buyers to pay for the land the home was to be built on with the contingency money.  Specifically, Plaintiff alleges one of the buyers was to pay her sister, a Social Security recipient, the $10,000, after the sister quit-claimed the deed to the buyer, thereby hiding the transaction from the Social Security administrative offices.  (Setzer Depo. 221, 225, 234, 408, 474, 476).   Repeated arguments with the TK salespeople and Plaintiff  arose concerning this loan, which Plaintiff refused to process on the July 26, 2002, scheduled closing. (DeWitte Depo. 135-137; Setzer Depo. 243-244, 250-251).  The loan eventually closed and Plaintiff subsequently received, and cashed, the commission check on the loan. (Setzer Depo.  286-287; DeWitte Depo. 220-221).

Defendants contend prior to the loan incident, and beginning in as early as May 2002, Messrs. Dewitte and Riegle received complaints from TK customers and salespeople regarding Plaintiff's performance of her loan processing responsibilities. (Riegle Depo. 61-66, 69-71, 76-81; DeWitte Depo. 129-131, 155). On August 5, 2002, Plaintiff met with Messrs. DeWitte and Riegle to discuss the current employment situation.  Plaintiff presented a written outline to Messrs. DeWitte and Riegle explaining her concerns with her position.  (Riegle Depo. 75-76, 82-83; Setzer Depo. 369-370, 397-402).  It was at this meeting that Plaintiff was terminated.  Messrs. DeWitte and Riegle explained to Plaintiff the TK salespeople had lost confidence in her abilities and her relationship with them had been severed.  (Riegle Depo. 61, 75; Setzer Depo. 288-289).

---

cash back at closing of the home.  (Riegle Depo.  40; DeWitte Depo 84-86).

On September 3, 2002, Michael Hudson, a male, was hired as a Heartland Mortgage officer for the Fairfield, Ohio office. (DeWitte Ex. 16; Kronenberg Dep. 46). Mr. Hudson served as the only loan officer in this office for the year following Plaintiff's termination. (DeWitte Dep. 62-63). On or around August 1, 2003, Connie Arbino, a female, was hired to replace Mr. Hudson after his termination. (DeWitte Ex. 16; DeWitte Depo. 63).

## II. ARGUMENTS OF THE PARTIES

### A. Defendants' Argument

Defendants argue that Plaintiff's claim for gender discrimination fails as a matter of law because Plaintiff cannot establish a *prima facie* case of gender discrimination under Title VII or O.R.C. §4112.02. In the alternative, Defendants argue, that even if Plaintiff could establish a *prima facie* case for gender discrimination, the evidence establishes that Plaintiff was terminated for a legitimate, non-discriminatory reason, and thus, cannot show that her dismissal was pretextual.

In addition, Defendants contend Plaintiff's claim for retaliation in violation of public policy fails as Plaintiff failed to state it with sufficient clarity to provide Defendants with notice of what claim was being asserted. Alternatively, if the claim is allowed, Defendants argue the legal basis and timing of the claim are insufficient to defeat summary judgment.

Further, Defendants maintain Plaintiff's public policy claims must fail because Plaintiff cannot establish her underlying claims of gender discrimination and retaliation. Specifically, Plaintiff cannot establish that her termination was motivated by conduct

related to a clear public policy or that Defendants lacked a legitimate business justification for her termination.

Finally, Defendants assert Plaintiff's claim for breach of contract must fail, because she was an at-will employee and there is no evidence that she suffered damages due to any alleged breach.

### B. Plaintiff's Argument

In response, Plaintiff argues summary judgment should be denied with respect to Plaintiff's Title VII gender discrimination claim and her state gender discrimination claim. Plaintiff contends a reasonable finder of fact could properly conclude that genuine issues of material fact exist as to whether she was replaced by a male, and whether similarly-situated males received more favorable treatment.

Additionally, Plaintiff asserts summary judgment should be denied with respect to Plaintiff's public policy claim. Plaintiff argues, genuine issues of material fact have been raised in regards to her wrongful termination claim based on her gender discrimination claims and her retaliatory discharge claim based on her refusal to participate in activities which she believed were fraudulent and illegal.

Finally, Plaintiff concedes summary judgment is appropriate on Count IV, Breach of Contract in Violation of Ohio law (Doc. 25 at 2).

## III. ANALYSIS

### A. Summary Judgment Standard

Summary Judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file...show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). " The party moving for summary judgment bears the initial responsibility of showing that there is an "absence of a genuine issue of material fact." *Celotex Corp. V. Catrett*. 477 U.S. 317, 323 (1986). Moreover, where a "non-moving party has failed to make a sufficient showing on an essential element of [their] case with respect to which [the non-moving party] has the burden of proof," the moving party will be entitled to summary judgment. *Id*. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Id.* at 248.

**B.    Gender Discrimination**

Title VII of the Civil Rights Act of 1964 and O.R.C. §4112 make it unlawful for an employer to discharge or otherwise discriminate against an employee on the basis of sex. 42 U.S.C.A. 2000e-2; *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192 (Ohio 1981)[3]. In order to establish a cause of action for gender discrimination. Plaintiff must satisfy the burden shifting analysis developed in the *McDonnell Douglas Corp. v. Green*, 411 N.S. 792 (1973):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate

---

[3] The Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to cases involving alleged violations of O.R.C §4112.

> some legitimate nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Department of Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### 1. Prima Facie Case

Plaintiff carries the initial burden of establishing a *prima facie* case of gender discrimination. As such, Plaintiff must show:

(1) she was a member of a protected class;
(2) she was qualified for the position she held;
(3) she suffered an adverse employment action; and
(4) she was replaced by a male or treated differently from similarly situated males.

*McDonnell Douglas*, 411 U.S. at 802. *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538-39; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). With respect to the third element, Plaintiff need only show she was objectively qualified for the position. *Wexler v. White's Fine Furniture. Inc.*, 317 F.3d 564, 574-76 (6th Cir. 2003). Plaintiff may do this by "presenting credible evidence that...her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 576

Plaintiff is able to meet the first three requirements of the *prima facie* case. As a female, Plaintiff was a member of a protected class and suffered an adverse employment action in the form of discharge. The Court also finds, based upon Plaintiff's education and experience, she was objectively qualified for the position. Therefore, the

central issue for debate, is the fourth prong, whether Plaintiff was replaced by a male or treated differently from similarly situated males.

Plaintiff alleges upon her termination she was replaced by Mr. Hudson. The undisputed evidence establishes Mr. Hudson interviewed prior to Plaintiff's termination and was subsequently hired after Plaintiff's termination. (Dewitte Depo. 57-58). Although Defendants argue that Mr. Hudson was interviewed and ultimately hired as a replacement for Mr. Trovillo, the Court concludes, construing the evidence most strongly in Plaintiff's favor, a genuine issue of material fact exists as to whether Mr. Hudson replaced Plaintiff. The Court reaches this conclusion based on the proximity in time between Plaintiff's discharge and Mr. Hudson's hiring, and the evidence which established that Mr. Hudson became the designated branch manager for HUD purposes, a position previously held by the Plaintiff.

### 2. Pretext

For the purpose of this opinion, the Court assumes Plaintiff establishes a *prima facie* case of gender discrimination. As such, the burden shifts to Defendants to provide a legitimate, non-discriminatory reason to terminate her employment. *McDonnell Douglas,* 411 U.S. at 802.

Defendants maintain Plaintiff was terminated because the TK salespeople had lost confidence in her. The undisputed evidence shows this was the reason given to Plaintiff for her termination. Therefore, Defendants met their burden of providing a legitimate non-discriminatory reason for Plaintiff's termination and the burden shifts

back to Plaintiff to present evidence that the proffered reason given by Defendants was a pretext for illegal discrimination. *Id*. at 804.

In order to establish that Defendants' reason for Plaintiff's termination was pretextual, Plaintiff must demonstrate:

(1) that the proffered reasons had no basis in fact;
(2) the proffered reasons did not actually motivate [her] discharge, or
(3) that they were insufficient to motivate her discharge.

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

In support, Plaintiff advances four arguments. First, the unwillingness of the TK salespeople to work with Plaintiff was caused by Plaintiff's refusal to process loan applications she believed to be fraudulent. Second, Plaintiff argues she received dissimilar treatment regarding customer complaints then other male employees. Third, Plaintiff contends Defendants failed to follow their own progressive disciplinary policy. Finally, Plaintiff maintains the timing of her termination creates a reasonable inference of pretext. Upon review, the Court finds Plaintiff's arguments to be insufficient for a reasonable trier of fact to find pretext for gender discrimination.  The Court finds Plaintiff's assertions fail to establish Defendants' proffered reasons had no basis in fact and that they did not actually motivate her discharge.

As to Plaintiff's first argument, rather then providing any evidence tending to show that Defendants proffered reasons were factually false or were insufficient to motivate her discharge, Plaintiff instead argues that the TK salespeople's refusal to work with her was motivated by her refusal to perform acts she believed violated RESPA and Social Security.  Assuming Plaintiff's assertions are true, Plaintiff fails to show a connection between her gender and the alleged violations of RESPA and Social

Security. Therefore, the Court finds Plaintiff fails to provide any evidence that gender played a role in the TK salespeople's refusal to work with Plaintiff.

Plaintiff also asserts she received treatment which was inconsistent from other similarly situated males concerning customer complaints. This argument must also fail. "Where a plaintiff alleges disparate treatment, liability depends on whether the protected trait actually motivated the employer's decision." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000), citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). Currently, Plaintiff fails to provide any evidence establishing that her termination was based on customer complaints, rather then her alienation of the TK sales people. As such, any alleged gender bias by Defendants in dealing with customer complaints regarding loan officers is irrelevant.

Plaintiff's third argument, that Defendants failed to follow their own disciplinary policy, is also insufficient. As Defendants argue, the disciplinary policy upon which Plaintiff relies was contained in NC Mortgage's employee handbook. The evidence clearly establishes Plaintiff's employment was transferred from NC Mortgage to Heartland Mortgage. Thus, at the time of her termination, Plaintiff was a Heartland Mortgage employee. Plaintiff fails to provide any evidence showing that Defendants were required to follow the NC Mortgage disciplinary policy for Heartland Mortgage employees, or that they applied this disciplinary policy to any similarly situated males who were Heartland Mortgage employees. As such Plaintiff's argument must fail.

Finally, Plaintiff argues the timing of her dismissal creates a reasonable inference of pretext. "[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact

pretextual." *DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed. Appx. 387, 393 (6th Cir. 2005). "However, it is also clear that suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Id.*

In *DeBoer*, an employee was demoted one day after informing her supervisor that she was pregnant. *Id.* at 388. The *DeBoer* court found, that because the employer had never questioned the employees skills until she informed him that she had become pregnant, the timing of her demotion was suspicious. *Id.* at 393. Here, Plaintiff argues her termination from employment was made within days of her refusal to process a loan she believed violated the Social Security laws. However, the record indicates TK salespeople complained about Plaintiff's performance prior to her refusal to close the loans which she felt were violating the law. Further, even if Plaintiff had not received earlier complaints, Plaintiff fails to provide any evidence showing a causal link between her refusal to process loans she believed were fraudulent and her gender.

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** on Counts I and II of Plaintiff's Complaint.

    **C.    Public Policy Claims.**

The Court next turns to Plaintiff's wrongful discharge claim alleging violation of Ohio public policy under two separate statutory provisions. First, Plaintiff argues clear public policy can be ascertained from the statutory prohibition against discrimination set forth in O.R.C. §4112.02. Second, Plaintiff argues Defendants terminated her in retaliation for her refusal to close a loan which she believed violated RESPA and Social Security, which violated public policy.

A cause of action for wrongful discharge in violation of public policy is recognized as an exception to the employment-at-will doctrine. See *Greeley v. Miami Valley Maint. Contractors, Inc.,* 49 Ohio St.3d 228 (1990); *Painter v. Graley*, 70 Ohio St.3d 377, 382 (1994). To establish a cause of action for wrongful discharge in violation of public policy, Plaintiff must show:

> (1) a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element);
> (2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element);
> (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element);
> (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Painter*, 70 Ohio St.3d at 384. The clarity and jeopardy elements are questions of law and policy to be determined by the Court. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 151 (1997). The causation and justification elements are factual questions to be decided by a jury. *Collins v. Rizkana*, 73 Ohio St. 3d 65, 70 (1995).

### 1. Clarity Element

Plaintiff presents two separate underlying claims as the basis of her public policy claim. The Court will address each separate claim in turn.

#### a. Gender Discrimination

As shown below, Plaintiff cannot establish an underlying claim of gender discrimination, and therefore cannot show a violation of public policy. This Court has held that when a defendant is entitled to summary judgment based on a plaintiff's Title VII discrimination claim, judgment is also appropriate on plaintiff's public policy claims.

*Jones v. Kilbourne Med. Labs.*, 162 F. Supp. 2d 813, 831 (S.D. Ohio, 2000). Accordingly, Defendants' Motion for Summary Judgment with respect to Plaintiff's public policy claim based on her underlying gender discrimination claim is **GRANTED**.

### b. Retaliatory Discharge

Defendants argue Plaintiff cannot establish her wrongful discharge claim in violation of Ohio public policy because she failed to place Defendants on notice of the retaliation claim. Additionally, Defendants contend, even if the claim is allowed, the underlying claim of retaliation fails as a matter of law.

In order to provide Defendants with notice pursuant to Fed.R. Civ. P. 8(a)(2), Plaintiff's Complaint need only contain "a short and plain statement of the claim that will give Defendants fair notice of what the Plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). Following this standard, the Court finds Plaintiff sufficiently plead claims sufficient to place Defendants on notice of her retaliation claim. Specifically in Paragraphs 17 and 18 of the Complaint, she states her discovery and reporting of possible RESPA violations to her supervisors. Further, Paragraph 37 of the Complaint specifically discusses retaliation against an employee for engaging in protected activity. Therefore, the Court concludes Plaintiff placed Defendants on sufficient notice of the retaliation claim.

Next, the Court must identify whether a clear public policy exists in Ohio which the alleged conduct violates. Currently, the statutes in question allow for the recognition of a cause of action for wrongful discharge in violation of public policy.

12 U.S.C. §2607 and RESPA prohibits kickbacks and unearned fees. Additionally, an individual who violates this section is subject to fines and/or imprisonment. Furthermore, Social Security law requires a recipient to report any change in income. 20 C.F.R. §416.708(c).

These are sufficiently clear expressions of public policy to justify an exception to the employment-at-will doctrine. As explained in *Collins v. Rikzana*, 73 Ohio St. 3d 65, 70-71 (1995):

> In order to more fully effectuate the state's declared public policy...the employer must be denied his generally unlimited right to discharge an employee at will, where the reason for the dismissal...is the employee's refusal to [violate the statutory provisions of RESPA and Social Security]. Although there may have been no actual crime committed, there is nevertheless a violation of public policy to compel an employee to...do an act ordinarily proscribed by law.

Therefore, the Court concludes a clear public policy existed and Plaintiff established the clarity element of her public policy claim.

### 2. Jeopardy Element

The Supreme Court of Ohio has adopted a three step framework for analysis of the jeopardy element in claims of wrongful discharge in violation of public policy:

(1) determine what kind of conduct is necessary to further the public policy at issue;
(2) decide whether the employee's actual conduct fell within the scope of the conduct protected by this policy; and
(3) consider whether employee's would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (2003).

In *Himmel*, an employee alleged he was terminated in retaliation for voicing complaints about his employer's conduct which allegedly violated Section 302 of the

Labor Management Relations Act (LMRA), "which prohibits employers and their agents from providing 'any...thing of value' to a union of union official." *Id.* at 597. In applying the first prong of the analysis, the *Himmel* court found '[r]eporting is essential to further the policy goals of a statutory provision like Section 302 because one can imagine any number of circumstances where corruption would likely go unnoticed in the absence of employee complaints." *Id.* at 600. Similarly, Plaintiff's complaints of Defendants' actions, concerning possible violations of RESPA and Social Security, are conduct necessary to further the public policy. As with *Himmel*, if an employee such as Plaintiff failed to voice complaints with respect to alleged violations, the violations would likely go unnoticed. Therefore, the Court finds Plaintiff's actions are sufficient to satisfy the first prong step of the *Himmel* jeopardy element.

This Court also finds Plaintiff satisfies the second and third prongs of the jeopardy analysis. As Defendants' alleged misconduct implicates the aforementioned sections of RESPA and Social Security, Plaintiff's complaints fall within the scope of these statutes. Further, the *Himmel* court recognized that permitting an employer to dismiss an employee for retaliation to complaints about the employer's potential illegal activities would discourage other employees from making similar complaints. *Id.* at 601. Further, permitting Defendants to dismiss Plaintiff in retaliation for lodging her complaints regarding the alleged statutory violations would discourage other employees of Defendants from complaining about future conduct which may violate these or other statutes. According, viewing the facts in light most favorable to the Plaintiff, the Court finds dismissing an employee under circumstances like those alleged by Plaintiff, would jeopardize the public policy.

### 3. Causation and Overriding Justification Elements

As previously stated, the causation and overriding justification elements of a *Greeley* analysis are issues for the jury to resolve. *Himmel*, 342 F.3d at 599. It is clear Plaintiff establishes a genuine issue of material fact with respect to these two elements making summary judgment improper. Support for this conclusion is found In *Himmel*. The employer argued Mr. Himmel was terminated for violating company policy. Mr. Himmel presented contrary evidence suggesting his termination was motivated by his complaints about the employer's violations of public policy. *Id.* The *Himmel* court concluded, "[i]n light of the parties' disputes about the facts and how to interpret them," the employee established a genuine issue of material fact as to the causation and overriding justification elements of his *Greeley* claim.

Similarly, Defendant argues Plaintiff failed to present any factual questions for the jury to consider. However, reviewing the evidence in a light most favorable to Plaintiff, the Court concludes genuine issues exist as to whether Plaintiff was terminated based on her refusal to follow procedures she believed were illegal and her related complaints to supervisors. Accordingly, Defendant's Motion for Summary Judgment with respect to its Public Policy Claims and underlying retaliation claim is **DENIED**.

### IV. <u>CONCLUSION</u>

The Court finds genuine issues of material fact do not exist with respect to Plaintiff's Title VII gender discrimination claim, state discrimination claim, public policy claim based on gender discrimination and breach of contract claim. However, the record in this matter indicates genuine issues of material fact exist with respect to her

claim for her public policy claim based on retaliatory discharge.  Accordingly, Defendant's Motion for Summary Judgment is **GRANTED IN PART** as to Counts I, II, IV and III based on gender discrimination and is **DENIED IN PART** as to Count III based on retaliatory discharge.

    **IT IS SO ORDERED.**

                                  /s/ Michael H. Watson
                              Michael H. Watson, Judge
                              United States District Court